**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**AT KANSAS CITY**

| | |
|---|---|
| TAMMY PEASE, | ) |
| | ) |
|        **Plaintiff,** | ) |
| | )   **Case No.:** |
| v. | ) |
| | )   **REQUEST FOR JURY TRIAL** |
| BRIGGS AUTO GROUP, INC., | ) |
| | ) |
|        **Defendant.** | ) |

Serve Registered Agent:
Russell K. Briggs
2312 Stagg Hill Road
Manhattan, Kansas 66502

## COMPLAINT FOR DAMAGES

COMES NOW Plaintiff, Tammy Pease, and for her claims against the above-named Defendant, alleges and states as follows:

1. Plaintiff is, and at all times set forth below was, a resident of Kansas.

2. Defendant is a corporation, organized under the laws of Kansas with its principal place of business in Manhattan, Kansas.

3. Defendant works in an industry affecting interstate commerce, in that Defendant sells automobiles manufactured in various other states, which are used by consumers throughout the United States and on interstate highways.

4. Defendant employed more than 15 employees in 2017, 2018 and 2019.

5. Defendant is thus subject to the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*.

6. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as Counts II and III of Plaintiff's Complaint arises under the laws of the United States,

1

specifically the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*.

7. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Count I of Plaintiff's Complaint, as that count is so related to the claims encompassed within Counts II and III as to form one case or controversy.

## FACTS COMMON TO ALL COUNTS

8. Plaintiff was hired by Defendant on or about July 23, 2015.

9. Plaintiff worked at one of Defendant's car lots as a Lot Porter, and eventually became an Office Assistant in 2017.

10. As an Office Assistant, one of Plaintiff's primary duties was getting customer trade-in vehicles and auction-purchased vehicles were ready for resale by Defendant.

11. Vehicles that were awaiting registration were kept off the lot by Defendant.

12. Specifically, these vehicles were kept in a separate lot that was enclosed in a locked fence.

13. Only upper management had access to the key from this locked fence.

14. Only a few individuals had access to the keys for these vehicles, including Plaintiff, another Office Assistant, and upper management.

15. The keys for the vehicles were stored in a locked box which required a personalized numeric code to unlock.

16. The purpose of these personalized codes was to track which staff member had accessed the keys.

17. Plaintiff and the other Office Assistant, Zack Douglas were provided with programmable key fobs because they were frequently required to access the keys of these

2

vehicles.

18. An Office Assistant would have to access the locked key box in case a mechanic or detailer needed a car for some purpose.

19. On September 29, 2017, Plaintiff was hurt in the course and scope of her employment.

20. Plaintiff slipped and fell exiting a truck.

21. Plaintiff struck both the running board of the truck and the concrete floor as a result of her fall.

22. Plaintiff felt immediate pain in her head, shoulder, hip, right knee, and lower back.

23. A coworker helped Plaintiff up from the fall.

24. Plaintiff was then sent for authorized medical treatment for her work-related injuries.

25. Defendant, as Plaintiff's employer, controlled her medical treatment pursuant to the Kansas Workers' Compensation Law.

26. Plaintiff received extremely conservative, slow-progressing treatment for her work-related injuries.

27. Plaintiff's medical treatment was also bifurcated, with her head injury and should injury receiving initial medical consideration.

28. Plaintiff's regimen of treatment stretched out for over 15 months, and she finally underwent surgery to repair a torn bicep tendon on January 30, 2019.

29. Plaintiff was off work for approximately six months following her surgery, and then returned to work with restrictions.

30. Plaintiff was finally fully released from care for that injury on July 24, 2019.

31. Following this release, Plaintiff's direct supervisor, Shane Heberling, expressed relief that Plaintiff had gotten "that work comp stuff taken care of" and finished.

32. Plaintiff corrected Heberling and explained that she had only completed treatment for some of her injuries.

33. Plaintiff told Heberling that she was still in pain from her injured back and hip, and head that she would be seeing a new doctor for those issues in the next month or two.

34. Heberling expressed disappointment regarding this news.

35. Shortly after this interaction, Shane Sommars, the General Manager of Defendant, found Plaintiff and asked her what was "going on" with her medical treatment.

36. Plaintiff explained that she had been released from treatment for only one of her injuries, but was just starting treatment for others.

37. Sommars asked if Plaintiff would still be attending physical therapy and medical appointments.

38. Plaintiff replied that she didn't know.

39. Sommars was visibly upset by this answer.

40. Sommars then asked Plaintiff if she thought she would be having another surgery and missing work for that, too.

41. Plaintiff replied she didn't know.

42. Plaintiff told Sommars it could be another year before she even knew, just as it had been with the treatment of her bicep tendon.

43. Following these conversations, Plaintiff began to notice Sommars watching

Plaintiff more closely.

44. Sommars also began nit-picking Plaintiff's work and micromanaging Plaintiff.

45. This behavior was so extreme that a service technician commented to Plaintiff: "Sommars has really turned on you."

46. Other employees also noted the change in behavior exhibited by Sommars towards Plaintiff.

47. Plaintiff began attending medical appointments for her other injuries in September 2019, causing her to miss work.

48. On October 30, 2019, a 2006 Corvette (hereinafter "the Corvette") was traded in by a customer.

49. This vehicle was more expensive than vehicles typically traded in to Defendant.

50. The Corvette was placed in Plaintiff's area to process.

51. The Corvette was compatible with Plaintiff's programmable key fob, meaning she would not need to access the key aside from providing it to other employees.

52. Plaintiff locked the keys in the key box.

53. Shortly after the Corvette arrived, Heberling discussed with Plaintiff what he wanted done with the vehicle.

54. Heberling told Plaintiff that he did not believe this car would be sold on Defendant's lot, but instead sold "wholesale."

55. Based on this distinction, Heberling instructed that Plaintiff process the Corvette as a "wholesale" vehicle in Defendant's computer system.

5

56. This also greatly reduced what Plaintiff needed to do with the vehicle.

57. Plaintiff was able to get all necessary the vehicle's information that day, and did not intend on accessing the vehicle again.

58. The following day, Adam l/n/u, a service technician, came to take the keys for the Corvette.

59. Plaintiff assumed Adam was conducting an inspection of the newly-arrived vehicle, which is not out of the normal for new arrivals in Plaintiff's area.

60. Heberling was away from the dealership on vacation the following week, beginning November 3 and returning on November 11, 2019.

61. Unbeknownst to Plaintiff, Heberling received an email from Shane Voner, the General Sales Manager for one of Defendant's other dealerships regarding the Corvette.

62. Specifically, Voner confirmed that the Corvette should be processed as a "wholesale" and instructed Heberling to get the vehicle sold as such.

63. Heberling began looking for the physical vehicle that day, November 11, 2019.

64. Heberling was unable to locate the vehicle.

65. Heberling did not ask Plaintiff or Douglas about the location of the vehicle.

66. Heberling did not ask Plaintiff or Douglas about the location of the Corvette for three weeks.

67. On November 21, 2019, Plaintiff and Douglas were finishing up processing trade-ins ahead of the Thanksgiving holiday break.

68. The two found a fob that did not have any keys attached to it.

69. After processing the remaining vehicles, Plaintiff and Douglas determined

6

that the fob belonged to the Corvette.

70. Plaintiff checked the status of the Corvette in Defendant's computer system.

71. Plaintiff saw that it was still in the computer system as "wholesale."

72. Plaintiff assumed that the Corvette had been moved to the wholesale area and that the fob had been left in the box by the employee who moved the vehicle.

73. This was not an unusual occurrence, so Plaintiff and Douglas thought little of the discovery.

74. On December 2, 2019, the day following the Thanksgiving break, Heberling found Plaintiff shortly after she reported to work.

75. Heberling asked Plaintiff if she knew where the Corvette was located.

76. Plaintiff told Heberling that she did not.

77. Heberling then explained to Plaintiff that he had been looking for the Corvette since he received the November 11 email from Voner.

78. Plaintiff was shocked by the fact Heberling had neglected to ask her about the Corvette for three weeks.

79. Plaintiff asked Heberling, "Why didn't you say something!?"

80. Heberling did not provide an answer.

81. Plaintiff immediately recounted everything about the Corvette she knew.

82. This included that Adam had taken the key around October 31 and that a fob without keys had been found on November 21.

83. Heberling stated that he had been calling around the dealership to see if anyone had seen the Corvette.

84. Plaintiff asked Heberling if he had spoken to Douglas yet.

85. Heberling replied that he had not.

86. At that point, Defendant reported the Corvette as stolen to police.

87. Law enforcement officers came to the dealership to investigate.

88. Plaintiff was not interviewed as part of this investigation.

89. Douglas was instructed to fill out an incident report regarding what had occurred.

90. Douglas told Plaintiff that he had received the form from Shaun Criegen, a management employee of Defendant, and turned the completed report back in to Criegen.

91. Plaintiff sought out Criegen and asked if she should fill out a report.

92. Criegen told Plaintiff "don't worry about that."

93. Plaintiff found that odd, but left to return to performing her duties.

94. Plaintiff did not hear anything else about the Corvette for over a week.

95. On December 11, 2019, Heberling found Plaintiff to discuss the Corvette.

96. Heberling relayed to Plaintiff that Sommars had been asking why Plaintiff didn't fill out a report about the Corvette.

97. Plaintiff recounted what had happened with Criegen.

98. Heberling told Plaintiff to "just write down what happened" on a piece of paper and turn it in to Sommars.

99. Plaintiff did as instructed, leaving her statement on Sommars' desk.

100. On December 12, 2019, Plaintiff completed nearly her entire shift.

101. Around 4:40pm, Sommars brought both Plaintiff and Douglas into an office.

102. Heberling and Eli Goracke, a manager from another department, were waiting in the office.

103. Once in the office, Sommars informed Plaintiff that she was being discharged from employment.

104. Plaintiff asked why she was being discharged.

105. Sommars told Plaintiff that she was "involved" in stealing the car.

106. Plaintiff protested that she was not involved at all.

107. Plaintiff asked why Defendant believed she was involved.

108. Sommars replied "we have good evidence."

109. Plaintiff repeatedly asked what "evidence" Sommars was referencing that showed she was involved.

110. Sommars would not elaborate on that statement or discuss it with Plaintiff.

111. All actions or inactions of or by Defendant occurred by or through its agents, servants, or employees, acting within the course and scope of their employment, as set forth herein.

112. On or about May 26, 2020, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging that Defendant engaged in discriminatory actions that are being raised in this lawsuit, or alternatively, all conduct alleged herein would have arisen from the investigation of such Charge of Discrimination.

113. On or about July 13, 2020, the EEOC issued Plaintiff a Notice of Right to Sue and thereby closed the administrative matter associated with the Charge of Discrimination.

114. Plaintiff has fulfilled all conditions precedent to the bringing of these claims and has duly exhausted all administrative procedures prior to instituting this lawsuit in

9

accordance with the law.

## COUNT I - RETALIATION IN VIOLATION OF PUBLIC POLICY
## (KANSAS WORKER'S COMPENSATION ACT)

115. Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 114 of her Complaint, as though fully stated herein.

116. Plaintiff exercised rights granted by the Kansas Worker's Compensation Act.

117. These rights included but are not limited to receiving medical treatment, hiring legal counsel, and seeking other workers' compensation benefits.

118. Defendant took adverse actions against Plaintiff, including but not limited to:

   a. Micromanaging Plaintiff's work;

   b. Criticizing Plaintiff harshly for even small mistakes;

   c. Not communicating important information to Plaintiff regarding a missing vehicle;

   d. Discharging Plaintiff from employment;

   e. Accusing Plaintiff of being involved in theft; and

   f. Refusing to explain why Plaintiff was being accused of being involved in theft.

119. Defendant's adverse actions taken against Plaintiff were each based upon, and directly related to, Plaintiff exercising her rights granted by the Kansas Worker's Compensation Act.

120. Defendant's adverse actions against Plaintiff violate State public policy clearly declared by the Kansas Courts and the Kansas Legislature.

121. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff

has suffered irreparable injury, including past and future pecuniary losses, emotional pain, suffering, humiliation, inconvenience, mental anguish, loss of enjoyment of life, reduced employment opportunities, and will continue to suffer the same unless and until this Court grants relief.

122. Defendant acted toward Plaintiff with willful conduct, wanton conduct, and/or malice.

123. Thus, an award of punitive and exemplary damages is appropriate.

WHEREFORE, Plaintiff prays for judgment against the above-named Defendant in an amount in excess of $75,000, for the costs of this action, and for such other and further consideration and relief as the Court may deem just and equitable.

## COUNT II - DISABILITY DISCRIMINATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. § 12101 *et. seq.*

124. Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 123 of her Complaint, as though fully stated herein.

125. Plaintiff suffered from physical impairments that substantially limited one or more of her major life activities, including but not limited to her ability to work and lift.

126. Further, Defendant regarded Plaintiff's physical impairments as limiting Plaintiff from additional major life activities and for limiting Plaintiff from such activities for much longer than they actually did.

127. In reality, Plaintiff was always able to perform the essential job functions of her former position with reasonable accommodations.

128. Thus, Plaintiff suffered from a "disability" as defined by 42 U.S.C. § 12102(1).

129. Defendant took adverse actions against Plaintiff, including but not limited to:

   a. Micromanaging Plaintiff's work;

   b. Criticizing Plaintiff harshly for even small mistakes;

   c. Not communicating important information to Plaintiff regarding a missing vehicle;

   d. Discharging Plaintiff from employment;

   e. Accusing Plaintiff of being involved in theft; and

   f. Refusing to explain why Plaintiff was being accused of being involved in theft.

130. Defendant's adverse employment actions taken against Plaintiff were each based upon, and directly related to, Plaintiff's disability, including disability wrongfully attributed to Plaintiff by Defendant.

131. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered irreparable injury, including past and future pecuniary losses, emotional pain, suffering, humiliation, inconvenience, mental anguish, loss of enjoyment of life, reduced employment opportunities, and will continue to suffer the same unless and until this Court grants relief.

132. Defendant acted toward Plaintiff with willful conduct, wanton conduct, and/or malice.

133. Thus, an award of punitive and exemplary damages is appropriate.

134. Further, Plaintiff is allowed to recover her costs and attorneys' fees incurred in this matter.

WHEREFORE, Plaintiff prays for judgment against the above-named Defendant in

an amount in excess of $75,000, for the costs of this action, for attorneys' fees, for punitive damages, and for such other and further consideration and relief as the Court may deem just and equitable.

## COUNT III - RETALIATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. § 12101 *et. seq.*

135. Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 134 of her Complaint, as though fully stated herein.

136. Plaintiff engaged in activity protected by the Americans with Disabilities Act, including but not limited to requesting a reasonable accommodation, utilizing reasonable accommodations required pursuant to the Act, and informing Defendant of her intention to request additional reasonable accommodations in the future.

137. Defendant took adverse actions against Plaintiff, including but not limited to:

   a. Micromanaging Plaintiff's work;

   b. Criticizing Plaintiff harshly for even small mistakes;

   c. Not communicating important information to Plaintiff regarding a missing vehicle;

   d. Discharging Plaintiff from employment;

   e. Accusing Plaintiff of being involved in theft; and

   f. Refusing to explain why Plaintiff was being accused of being involved in theft.

138. Defendant's adverse actions taken against Plaintiff were each based upon, and directly related to, Plaintiff's protected activities.

139. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff

has suffered irreparable injury, including past and future pecuniary losses, emotional pain, suffering, humiliation, inconvenience, mental anguish, loss of enjoyment of life, reduced employment opportunities, and will continue to suffer the same unless and until this Court grants relief.

140. Defendant acted toward Plaintiff with willful conduct, wanton conduct, and/or malice.

141. Thus, an award of punitive and exemplary damages is appropriate.

142. Further, Plaintiff is allowed to recover her costs and attorneys' fees incurred in this matter.

WHEREFORE, Plaintiff prays for judgment against the above-named Defendant in an amount in excess of $75,000, for the costs of this action, for attorneys' fees, for punitive damages, and for such other and further consideration and relief as the Court may deem just and equitable.

## **DEMAND FOR JURY TRIAL**

Plaintiff requests a trial by jury in the United States District Court for the District of Kansas, to be held at the Robert J. Dole Federal Courthouse in Kansas City, Kansas, on all accounts and allegations of wrongful conduct alleged in this Complaint.

Respectfully submitted,

 */s/ Daniel L. Doyle*
Daniel L. Doyle, KS Bar No. 11260
Robert A. Bruce, KS Bar No. 28332
DOYLE & ASSOCIATES LLC
748 Ann Avenue
Kansas City, Kansas  66101
Telephone:  (913) 371-1930
Facsimile:  (913) 371-0147
d.doyle@ddoylelaw.com
r.bruce@ddoylelaw.com
ATTORNEYS FOR PLAINTIFF

15